Walter F. SWEENEY, Plaintiff,

v.

BERT BELL NFL PLAYER RETIRE-MENT PLAN, Bert Bell NFL Player Retirement Plan, Bert Bell/Pete Rozelle NFL Player Retirement Plan, Bert Bell NFL Player Retirement Trust, Bert Bell NFL Player Retirement Trustee, Bert Bell NFL Player Retirement Board, Bert Bell/Pete Rozelle NFL Player Retirement Plans Benefit Arbitrator, the NFL Player Supplemental Disability Plan, the NFL Supplemental Disability Plan Arbitrator, the NFL Supplemental Disability Plan Benefit Arbitrator, the NFL Player Supplemental Disability Plan Disability Board, the NFL Player Supplemental Disability Plan Trustee, and Does 7 through 100, Inclusive, Defendants.

BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN, Counterclaimant,

v.

Walter F. SWEENEY and Jean Merchant, Counterclaim-defendants.

No. Civil 94–1443–B (CM).

United States District Court, S.D. California.

April 21, 1997.

Michael T. Thorsnes, Rhonda J. Thompson, Country Club Hills, IL, for plaintiff.

William F. Hanrahan, Douglas W. Ell, Washington, DC, Daniel R. Salas, San Diego, CA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BREWSTER, District Judge.

This action came on for hearing before the Court on January 21, 1997, Honorable Rudi M. Brewster, United State District Judge presiding, with appearances by Rhonda J. Thompson and Michael T. Thorsnes for the Plaintiff, and William F. Hanrahan, Douglas W. Ell and Daniel R. Salas for the Defendants. After the hearing and pursuant to the Court's oral order, Plaintiff submitted Proposed Findings of Fact and Conclusions of Law to the Court. Defendants filed their objections, and Plaintiff filed a response. After due consideration of the documents filed by all parties, the Court hereby makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Bert Bell NFL Player Retirement Plan was established in 1962 to provide retirement, disability and related benefits to eligible former professional football players (the "Old Plan"). In 1994 the Pete Rozelle NFL Player Retirement Plan (established in 1989) was merged into the Bert Bell NFL Player Retirement Plan, which was renamed the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan", "New Plan", or "Base Plan").

2. The NFL Player Supplemental Disability Plan ("Supplemental Plan") was established in 1993 to provide disability benefits in addition to those provided under the New Plan. The New Plan and Supplemental Plan are occasionally hereafter referred to as "the Plans".

3. The Plans were established pursuant to a Collective Bargaining Agreement ("CBA") between the National Football League Players Association ("NFLPA"), the exclusive collective bargaining representative for NFL players, and the National Football League Management Council ("NFLMC"), the exclusive collective bargaining representative for NFL clubs. The CBA was ratified in 1993, effective through 2000. The Plans are employee benefit plans covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001–1461. The New Plan is an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2). The Supplemental Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

4. In addition to retirement benefits, the Plan provides disability benefits to eligible participants (i.e., certain active players and vested inactive players) who become totally and permanently disabled. Under the Old Plan, in effect prior to July 1, 1993, an eligible player was "deemed to be totally and permanently disabled if the Retirement Board shall find that he has become totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment or remuneration of profit." 1986 Plan § 5.2. Under the Old Plan, there were two levels of benefits payable for total and permanent disability: (a) a higher "football" benefit for a disability which results from a "football injury"; and (b) a lower "nonfootball" benefit for disability resulting from other than a football injury. 1986 Plan § 5.1.

5. Under the New Plan, an eligible player is "deemed to be totally and permanently disabled under Article 5 if the Retirement finds that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any activity for remuneration or profit.

In place of the two-tiered classification system under the Old Plan, the New Plan awards benefits pursuant to the following 4-point classification scheme:

(A) (Active Football). The monthly total and permanent disability benefit will be no less than $4,000 if the disability results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled 'shortly after' the disability first arises.

(B) (Active Nonfootball). The monthly total and permanent disability benefit will be no less than $4,000 if the disability does not result from League football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled 'shortly after' the disability first arises.

(C) (Football Degenerative). The monthly total and permanent disability benefit will be no less than $4,000 if the disability arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season.

(D) (Inactive). The monthly total and permanent disability benefit will be no less than $1,500 if (i) the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player, or (2) the disability arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's Last Credited Season. The minimum benefits provided under this Section 5. 1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will be not be offset by worker's compensation.

The first three categories provide a minimum monthly benefit of $4,000. The Inactive category provides a minimum monthly benefit of $1,500.

In § 5.1 of that Article, the New Plan states that all benefits provided by Article 5 of the New Plan "will be retroactive to the later of(a) the first of the month following the date of the total and permanent disability, or (b) July 1, 1993, and will be payable for life or until cessation of such total and permanent disability."

6. Per Article III thereunder, the Supplemental Plan automatically awards additional benefits, corresponding to the 5.1(a) classification (Active Football) of the New Plan as follows: $4,335 per month from July 1, 1993 to February 28, 1995; increasing to $8,500 per month from March 1, 1995 to February 28, 1997, and increasing further to $12,670 per month from March 1, 1997 to February 28, 2000.

7. The defendants can undertake a disability re-examination of Sweeney under § 5.3 of the New Plan after his normal retirement date "if (a) he has not yet attained age 70, (b) three voting representatives reasonably believe that he may no longer be totally and permanently disabled, (c) he has not been re-examined during the preceding 36 months, (d) such re-examination does not require the person to travel to an extent deemed medically inadvisable, and (e) his Normal Retirement Date is after September 30, 1993." The Court interprets this section to mean that Sweeney can be examined 36 months after his last examination, which took place on August 24, 1994. The Plan therefore has the right to examine Sweeney at the earliest, on August 24, 1997, provided all other applicable requirements are satisfied.

8. The Retirement Board is the named fiduciary and administrator of the New Plan. The Disability Board is the named fiduciary and administrator of the Supplemental Plan. Each Board has six voting members; three are appointed by the NFLPA, and three by the NFLMC. By the terms of the Plans, the Retirement Board and the Disability Board have full power, authority and discretion to interpret the Plans and decide claims for benefits under the Plans. The Retirement Board generally meets four times a year to consider and decide both applications for benefits and appeals of decisions on applications for benefits.

9. For fourteen seasons, from 1963 through 1976, Plaintiff Walter Sweeney played professional football with the National Football League, first with the San Diego Chargers and, for his final four seasons, with the Washington Redskins. Plaintiff has been a NFL Players Association dues-paying

member since the beginning of his football career to the present. Plaintiff has earned 14 "credited" seasons.

10. Playing professional NFL football is a stressful, violent, painful, and injury-riddled occupation that places extreme pressure on players to win.

11. From almost the start of his NFL career, coaches and trainers with the San Diego Chargers and later the Washington Redskins recommended and supplied to Sweeney a plethora of prescription-strength controlled substances to increase his stamina, resistance to pain, and durability Plaintiff began taking Dexadrine and steroids at the strong advice of Chargers coaches and trainers in 1963. At one point, Sweeney was fined an exhibition game check if he refused to take the steroids. In 1964, the Chargers trainer began distributing Desbutol (combination upper/downer). Because of the resultant difficulty sleeping, the Chargers doctor prescribed Seconal for Plaintiff, and continued to fill the same prescription for the next five years without ever writing a new one. In 1970, the Chargers began administering Desoxyn (pure speed). In 1971, after Plaintiff complained to Chargers doctor Mandel that the amphetamines made him feel depressed and suicidal, the doctor recommended Plaintiff smoke marijuana. Sweeney.was subjected to even more outrageous drug practices upon being traded to the Redskins in 1974, after the 1973 drug scandal in which players and teams, including the Chargers, were fined for their indiscriminate drug administration.

12. An indiscriminate administration of amphetamines by trainers before Sunday games and important practice sessions followed by post-contest barbiturates of various sorts also administered by team trainers and physicians was Sweeney's typical regimen for approximately the last ten years of his pro-football career.

13. The fact that Plaintiff was given these narcotics by the medical and training department of the NFL teams was an assault on his body which injured plaintiff. Plaintiff is suffering from an injury to his mind because of the assault on his body by these narcotics, just as much as if it were a blow to the head.

The drugs were an assault on his body and caused Sweeney damage. It is a contact with a foreign object into his body either by needle or by swallowing it. It is still an impact done to his body by the narcotics. It is an introduction of the narcotics into his body and that can be as gentle or as violent as is describable: it is still an intrusion of the narcotics into his body—and the NFL teams put that into him.

14. The reason Sweeney was given all of the narcotics was to help him get over the pain and stiffness of his injuries to get him on the playing field, playing like a 19-year-old kid. That was the reason they gave him these drugs, to pump him up so he did not . feel any pain. When the players go out on the grid iron they beat the hell out of each other and then they go back into the locker room and the trainers give them downers to calm them down and help them sleep. In other words, it is the pressure to win and the injuries that necessitate the drugs.

15. There is no evidence in the record to contradict the findings set forth above.

16. During the last game of the 1975 regular season, plaintiff severely injured his knee. Doctors could not operate on Plaintiff for three days because of the drugs in his system.

17. Plaintiff's injury appeared to have healed during the off-season, but during the pre-season of 1976 plaintiff seriously re-injured it and has been disabled ever since.

18. Realizing that his career was over, and under a paranoid influence of drugs, Plaintiff emptied a revolver into his unoccupied bunk at training camp during his 1976 season, and was officially cut from the Redskins roster the next day. That is the point at which Plaintiff's disability arose and Plaintiff became totally and permanently disabled.

19. Plaintiff reported to training camp and played every season from 1963 to 1976, thus illustrating he was not disabled during those years.

20. There is no contradictory evidence in the administrative record to Plaintiff's claim that his drug addition is football-related.

21. Plaintiff's work history from 1976 to the present is sporadic, largely because his chronic drug addiction has persisted even to the present time. Plaintiff could not get or hold a decent job.

22. From 1977 through 1980, Plaintiff reported no income, subsisting off a $25,000 workers' compensation award he received from the Redskins organization for his knee injury, an "early payment" benefit of $14,923 from the Old Plan, sundry loans and gifts from friends, and his wife's income.

23. From February through June of 1980, Plaintiff tried working as a substitute teacher in his home town in Massachusetts, and for the next five months he attempted working on a friend's commercial fishing boat in that state.

24. From mid–1981 through mid–1982, Plaintiff worked as a bartender in San Diego, earning about $3,765 in 1981, and $5,703 in 1982.

25. Plaintiff lost all of these jobs because of the lingering effects of his chronic and continuing drug addiction.

26. In July of 1982, Plaintiff entered a drug-rehabilitation program at Sharp Cabrillo Hospital but left after only one month. One of his fans occupied a management position there and "created" a position for Plaintiff at the hospital. Plaintiff, still addicted to drugs and alcohol, purported to be a motivational speaker for recovering addicts.

27. In 1983 Plaintiff realized $3,001 in self-employment income from speaking fees.

28. In late 1983, Plaintiff returned to Boston. In spring or summer of 1984, he secured a position as an "employee ombudsman" at Telco Systems Fiber Optics Corporation in Norwood, MA Plaintiff's job was to lecture employees—among whom drug use was apparently a problem—on the dangers of drug addiction. The president of that corporation hired Plaintiff both because of his experience in team sports, his ex–NFL star status, and because of his experience with drugs. Plaintiff earned $12,846 at Telco in 1984, $32,146 in 1985, and $30,049 in 1986. During that same period, Plaintiff also realized income from speaking engagements: $1,501 in 1984; $6,838 in 1985; and $3,151 in 1986. When the company changed ownership in 1986, Plaintiff was discharged. Plaintiff's performance in his position at Telco was woeful; consisting of sporadic absences, and continued drug abuse while "counseling" others to overcome their drug problems. Plaintiff remained on the payroll only because Mr. Bowman was unaware of Plaintiff's unacceptable performance, and had he known of Plaintiff's drug abuse he would have terminated Plaintiff forthwith.

29. In 1986, after being terminated from Telco when new management took over, Plaintiff received a sales job with Sharp Cabrillo Hospital in San Diego. Plaintiff's job was to speak to various groups throughout the county in an effort to drum up business for the hospital. Plaintiff earned $1,269 at the hospital in 1986, $41,776 in 1987, $43,280 in 1988, and $12,047 in 1989. During that same period, Plaintiff also received self-employment income of $4,674 in 1987 and $4,840 in 1988, presumably for speaking engagements or endorsements. Plaintiff was discharged from Sharp Cabrillo after a quarrel with his supervisor.

30. Plaintiff's drug abuse was so bad during the early nineties that he was unable to cope in any kind of professional environment. Plaintiff often acted irrationally thinking that others were out to get him. He had no organization in his life and was constantly getting high, at work or at home, on whatever drugs were available. Plaintiff's constant drug abuse continued while he was counseling other drug abusers.

31. For the rest of 1989, Plaintiff worked as a drug counselor and a referral agent for several local hospitals. Plaintiff received $14,715 in self-employment earnings and $5,385 from a local hospital. His total income for 1989 was $32,147.

32. In 1990, Plaintiff worked at but was fired from a silk screening business. Using $15,000 borrowed from a friend, Plaintiff then tried to start his own silk screening company, but that business failed.

33. Plaintiff's total earned income for 1990 was $2,720.

34. In 1991, Plaintiff earned $6,001 with a logo design business.

35. No other earnings or employment figures for Plaintiff appear in the record.

36. Plaintiff's drug abuse continued incessantly after he left the NFL. To the distress and embarrassment of his family, Plaintiff was unable to stop using cocaine, alcohol, marijuana, amphetamines, quaaludes, and just about anything else he could get his hands on. He was unable to provide support for his family and his daughter recollects being frequently embarrassed and humiliated by her father's conduct.

37. Plaintiff may be particularly vulnerable to substance addiction by his inherited genes. There was a history of alcoholism in his father's family and all his brothers save one were or are alcoholics. On top of his being addicted to drugs, Plaintiff has himself become an alcoholic.

38. Without legal representation, Plaintiff initially filed a disability application with the Board on August 17, 1989, claiming that his knee injury left him permanently disabled.

39. The Retirement Board considered but denied Plaintiff's claim on September 29, 1989. Plaintiff appealed by letter on November 19, 1989. On December 14, 1989, the Board denied Plaintiff's appeal. Neither side mentioned Plaintiff's drug addiction.

40. On December 13, 1993, this time represented by legal counsel, Plaintiff filed the application at issue in the present action with the New Plan, alleging the NFL was responsible for causing his substance abuse total and permanent disability. The 1993 application differed materially from the first application in that, while Plaintiff maintained that his disability arose from his knee injury, this time Plaintiff supplied the Board reports about his drug addiction and resulting psychological state.

41. Defendants tabled Plaintiff's application on January 19, 1994 and suggested Plaintiff be examined by Defendants' psychiatrist, Dr. Jen Kin. Plaintiff's counsel appeared at the subsequent April 12, 1994

Board Meeting in San Francisco to argue Sweeney's case. They were asked no questions. On April 19, 1994, Defendants again tabled Plaintiff's application to seek a "clarification of Dr. Jen Kin's report." Plaintiff submitted additional evidence and argument for the subsequent May 25, 1994 Board Meeting. On June 30, 1994, Defendants again tabled Plaintiff's application, this time requesting "further information regarding Mr. Sweeney's condition" and requested an assessment of him by substance abuse specialist, Dr. Gary Eaton, which Plaintiff underwent. On July 28, 1994, Plaintiff put Defendants on notice of his intent to file an ERISA action.

42. On October 26, 1994, Defendant sent Plaintiff a written denial of his claim, and for the first time, gave the reasons therefore. Defendant did, however, classify Plaintiff's disability under Section 5.1(d) of the New Plan, retroactive to the date of his December 1993 application and concluded it was not necessary to determine whether Plaintiff's claim "arose from League Football Activities" because Defendants determined the effective date of Plaintiff's disability was December 1, 1993, the date Plaintiff applied for benefits, more than 12 years after his last credited season.

43. Plaintiff learned that if he wished to appeal the October, 1994 administrative decision, he would have to submit evidence of his work history, tax returns, and social security earnings reports, as well as any medical records he had. Instead of exhausting his administrative appeal, however, Plaintiff filed the instant action in State Superior Court on August 12, 1994 for disability benefits wrongfully denied pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. §§ 1001–1461. Defendants removed the case to this Court on September 16, 1994 pursuant to 28 U.S.C. § 1441. The Court stayed the action on March 9, 1995, to permit Plaintiff to exhaust his administrative appeal. That administrative appeal was then filed on April 27, 1995. Plaintiff submitted the required information plus statements [1] by various doctors and

---

1. The Board does not require statements sworn under oath. The Court accepts these documents

as if they were sworn statements, since Defen-

Plaintiff's wife and daughter. The evidence submitted by Plaintiff included: Dr. Calvin Colarusso's November 1993 and March 1994 psychiatric evaluations; Dr. Stephen Silk's psychological evaluations (Plaintiff's doctors); Dr. James Jen Kin's and Dr. Gary Eaton's psychological evaluations (Plans' doctors); Dr. Richard Jones' vocational expert report; work and drug rehab chronologies by Nanci and Walter Sweeney; Dr. Arnold J. Mandell's article "The Sunday Syndrome" documenting the League's indiscriminate drug practices; Social Security earnings report; federal and state tax returns; and percipient witness declarations.

44.  On May 3, 1995, the Board issued its decision on administrative appeal.  In that decision, it once more denied Plaintiff's claim under 5.1(a) and reiterated its award under 5.1(d) of the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and its finding that Plaintiff was totally and permanently disabled thereunder.  However, the Board announced that, after a review of Plaintiff's employment history and other evidence, it had determined that Plaintiff became totally disabled as of January 1, 1990.  The Board also determined that Plaintiff would be awarded $1,827 per month, retroactive to that date, apparently applying the terms of the New Plan. The Board found that Plaintiff was not totally and permanently disabled during the period of January 1, 1984 to January 1, 1990.  In making this determination, the Board appeared to give little weight to Plaintiff's myriad submissions of doctors' assessments.  Rather, the Board found Plaintiff's significant earned income for these years to belie any reasonable finding of total and permanent disability.

45.  Plaintiff resumed his suit under ERISA, seeking a review of the Board's determination under an "abuse of discretion" standard.

46.  This Court reviewed, among other decisions by the Plan, its determination that Plaintiff was not totally and permanently disabled from 1984 to 1990.  The evidence shows that Plaintiff was performing very poorly during this period because of his addiction.  Plaintiff argued that the evidence

dants do not challenge the veracity of any of

demonstrated he was constantly abusing drugs during this period and the Court agreed.  Plaintiff further contended that he maintained his job on the strength of his reputation as a football star, rather than on his ability to perform and the Court found that this was most likely the case.  The evidence did show Plaintiff was abusing drugs during this period, but apparently this abuse was not detected to the point of revealing Plaintiff's impaired working ability, considering his duties took him out and about, as opposed to working in an office under direct observation of supervisors.  Plaintiff held his job at Telco for approximately two years when he was discharged after a change in ownership.  There is no indication that Plaintiff lost his job because of his substance abuse.  Plaintiff's employment at both Telco and Sharp Cabrillo Hospital demonstrated exploitation of Plaintiff's name.  Although the Plan may not have abused its discretion with respect to the 1984–1990 finding, this Court finds Plaintiff was disabled entirely and continuously from 1977 until the present time.  Plaintiff may have simply had some remission, recovery, or rehabilitation during such time, which later suffered a relapse.

47.  The Court also reviewed the Plan's determination that Plaintiff was not totally and permanently disabled during the period after Plaintiff's discharge from the NFL in 1976 to January 1, 1984.

48.  In 1976, Plaintiff's mental state was so impaired by drugs that he became paranoid and irrational and shot six rounds into his empty bunk, thus precipitating his discharge.  This act demonstrated Plaintiff's total loss of touch with reality.  It was at this time, concurrent with his exit from the NFL, that Plaintiff became totally and permanently disabled: This is the point at which Plaintiff's disability first arose.

The Board did not attribute much weight to the doctors' reports submitted by Plaintiff or requested by the Board.  Dr. James H. Jen Kin, Defendants' own doctor, stated in his report of May 20, 1994, "[t]he patient has [sic] a chronic substance abuse problem for multiple years...."

them."

49. Plaintiff suffers from a poly-substance abuse drug addiction as a direct result of the indiscriminate administration of highly addictive drugs to Plaintiff, including steroids and amphetamines, by the Chargers and the Redskins. The medical evidence demonstrates that his disability arose in 1977. Plaintiff had a recurrence of that same disability in 1990, he did not suffer a new disability. Significantly, for over the past year, Plaintiff has been and is currently involved in an intensive drug treatment program, which so far is encouraging.

50. Plaintiff is totally and permanently unable to engage in any occupation or employment for remuneration of profit, and such condition commenced concurrently with his extrication from the NFL in 1976. That total and permanent disability is directly related to, arising out of, and caused by NFL football activities. The Plans' doctor, Dr. Jen Kin, determined Plaintiff's injury/illness resulted from football-related activities. Drs. Silk, Colarusso (Plaintiff's doctors) and Eaton (Plans' doctor) all concluded Plaintiff is totally and permanently disabled, and that such condition has existed since 1976, and directly resulted from and arose out of the NFL's drug administration.

51. On August 4, 1995, this Court awarded Plaintiff Active Football total and permanent disability benefits per Section 5.1 of the Old Plan, retroactive to 1977 (with the exception of the six-year period from January 1, 1984 through December 31, 1989). During the course of a post-ruling status hearing, it was determined Plaintiff needed to amend the complaint to add the Supplemental Plan as an additional party to get an order for benefits thereunder.

52. On November 2, 1995 Plaintiff filed his first amended complaint, adding the Supplemental Plan as an additional Defendant, and seeking supplemental benefits thereunder.

53. On April 8, 1996, cross-motions for summary judgment were heard on issues relating to the Supplemental Plan.

54. The deemed payments provision of the Supplemental Plan (§ 3.2) authorized the Supplemental Plan to give additional benefits. Section 3.2 was never ratified, nor was any such ratification ever attempted. The only people who "consented" to it were the union representative and the owners' representative.

55. Even if Section 3.2 of the Supplemental Plan applied to Sweeney, which it does not, it results in a zero offset because Sweeney never received "payments" during the years covered.

56. Section 3.2 of the Supplemental Plan purports to offset payments only against players who had to sue in court to enforce their rights to receive their benefits which were wrongfully denied. As such, it discriminates against such people to eviscerate the supplemental benefits as to them. In other words, for any people who were wronged in the past, Section 3.2 attempts to wrong them again.

57. The CBA, Article LI, states that "additional benefits" will be provided under the Supplemental Plan, and says nothing about any offsets or qualifications. Article II, Section 1 of the CBA states that conflicting documents are superseded by the CBA. Section 3.2 of the Supplemental Plan conflicts with the CBA and is therefore unenforceable.

58. On June 14, 1996, this Court remanded to the Plans for them to determine, consistent with the Court's "Active Football"/5.1(a) findings, the appropriate classification of plaintiff's total and permanent disability under the New Plan and the Supplemental Plan, and to determine the amount of "Football" benefits owed for the periods of total and permanent disability prior to July 1, 1993.

59. On October 11, 1996, the Plans filed their Decisions on Remand which did not calculate Plaintiff's benefits, but rather, disagreed with the Court's findings based upon, among other arguments, a new argument that Plaintiff's "disease" was excluded from coverage under the Plan documents.

60. On January 21, 1997, Plaintiff's Motion for Relief from the Decisions on Remand was heard and all issues in the case were determined.

### CONCLUSIONS OF LAW

1. This action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. By this action, Plaintiff sought inter alia enforcement of the terms of the Plans documents and the CBA pursuant to 29 U.S.C. § 1132, including recovery of benefits thereunder, and for improper notice and wrongful denial of his claim for maximum total and permanent disability benefits under the Plans.

2. This Court has jurisdiction in this action under 29 U.S.C. § 1132(e).

3. Plaintiff is a beneficiary and/or participant as defined by ERISA and in the Plans because of his status as a former employee and former member of the NFL and NFLPA, who is eligible to receive benefits from the Plans. Plaintiff has standing to sue for benefits because of his status as a participant. Plaintiff occupied participant status as of the effective date of ERISA.

4. This Court has personal jurisdiction over the Defendants because they purposefully availed themselves of the privilege of conducting activities in San Diego, California by voluntarily obligating themselves to cover California employees who reside in San Diego County.

5. Venue is appropriate in this Court because the Plaintiff failed to receive his benefits in this jurisdiction.

6. Plaintiff exhausted his administrative remedies under the Plans by properly undertaking each and every requisite step thereunder, including but not limited to applying for total and permanent disability benefits under the Plans, appealing the Plans' denial of such benefits, and submitting to any and all medical examinations required by the Plans.

7. Those responsible for addicting Plaintiff must also assume responsibility for the results even though they may not have known he was particularly susceptible to addiction; one takes one's victim as one finds him.

■ 8. All retirement plans at issue in the present case give the Retirement Board discretionary authority to determine eligibility for benefits and to construe the terms of the plans. The abuse of discretion standard is thus the appropriate standard of review for this case.

9. Under this standard, Plaintiff proved to the extent outlined that the Board's determination was "arbitrary and capricious, unsupported by substantial evidence, instituted in bad faith, and erroneous on a question of law."

10. Sweeney proved on cross-motions for summary judgment that there is no genuine issue as to whether the Retirement Board abused its discretion.

11. The Court found an abuse of discretion by defendant Boards, and therefore resolved the dispute at issue in this case on the merits.

12. Plaintiff's interpretation of "disabled" was strained and extended.

13. The Court weighed defendant's resolutions of factual issues in the context of the statutory purposes of ERISA and the public policy which underlies this body of law.

■ 14. ERISA, like the Civil Rights Acts of 1871 and 1964, and the Labor–Management Reporting and Disclosure Act, is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans.

■ 15. Plaintiff submitted substantial evidence that his current substance abuse disability was caused by his employer's policies regarding unprescribed use of controlled substances, and that the disability arose during or immediately after his NFL career. Plaintiff's own statement, his wife's statement, as well as some of the doctors' reports before the Board support a finding that Plaintiff's disability arose from the drugs pushed upon him during his time in the NFL. There is no substantial evidence which contradicts this conclusion.

16. Based on the evidence before it, the Board could not reasonably have found that Plaintiff's disability was not caused by football-related activity during his employment in the NFL. Defendants abused their discretion by failing to find Plaintiff was entitled to football disability benefits from the date of

his discharge from the NFL in 1976 to January 1, 1984.

17. Defendants construed the Plans in a way which conflicted with the plain language of those Plans.

18. By finding that the Old Plan governed, but then applying the provisions of the New Plan, the Board acted arbitrarily and capriciously, thus abusing its discretion.

19. Because of the heavy substantiality of the evidence that his disability arises from a football injury, under the Old Plan, for his disability periods prior to 1993, Plaintiff is entitled to a "football benefit" thereunder.

20. Defendant did not abuse its discretion by finding that Plaintiff was not totally and permanently disabled from January 1, 1984 to January 1, 1990.

21. The Board did not abuse its discretion in finding Plaintiff totally and permanently disabled from 1990 to the present, but did abuse its discretion in classifying him as anything other than 5.1 "Football" for the period before July 1, 1993, and 5.1(a) "Active Football" for the period after July 1, 1993.

22. Defendants' position that Plaintiff's not engaging in off-season employment during the periods between 1963–1976 constituted "disability" was arbitrary and capricious and unreasonable.

■ 23. On the basis of the totality of the evidence before the Board, the Court finds Defendants abused their discretion by finding that Plaintiff was not totally and permanently disabled from the date of his discharge from the NFL in 1976 to January 1, 1984. Because the Court finds the evidence of disability during this period is substantially similar, and even more persuasive than the evidence of disability during the period from January 1, 1990 to the present when the Board found Plaintiff to be totally and permanently disabled, the Court holds that the Board's ruling that Plaintiff was not totally and permanently disabled from 1976 to 1984 to be sufficiently arbitrary and unsupported by substantial evidence as to be an abuse of discretion. From 1977 through 1980, it is unreasonable to assume Plaintiff earned more than $6,000.00 when the statements submitted by Plaintiff indicate only sporadic employment. The evidence indicated that Plaintiff attempted to find work for that period, which undermines the speculation suggested by the Board that Plaintiff might simply have been choosing not to work.

■ 24. Although chronic substance abuse may eventually lead to related mental or physical disability, the idea that addiction is permanent and beyond any hope of rehabilitation is one the court is reluctant to embrace. Neither the Old Plan nor the New Plan, as reasonably construed, can support anything other than a decidedly temporal definition of "permanently disabled." As counsel for Defendant stated at the oral hearing: "permanent is a slippery term in this context.... The word is in there to distinguish between those situations where someone is temporarily disabled, and it's likely that it is only temporary, as opposed to those situations where it is likely to be permanent, but likely isn't certain." Counsel thereupon defined permanent as "not likely that he's likely to get better." There is no indication that a subsequent finding that a player is no longer "totally and permanently disabled" represents an error in the original finding that he was "totally and permanently disabled."

25. A subsequent finding that a player is no longer "totally and permanently disabled" imply means that he is no longer in a condition which warrants the continued receipt of total disability payments, and nothing in either plan purports to preclude such a person from relapsing back into "total and permanent disability" and recover benefits therefore. Despite the fact that the word "permanently" in the Old Plan does not mean what the word ordinarily means, the Court concludes it adds something to the meaning of "disabled." The Court adopts the definition of "permanently disabled" offered by defense counsel at oral hearing as a reasonable interpretation of the phrase in the context of the Plans.

26. To support a finding of "totally and permanently disabled" therefore, the evidence must show that it is not likely that the player in question is likely to recover from his total disability. The determination of

how likely it is that the player is likely to get better must be made in light of the facts as known at that time.

27. To allow the benefit of hindsight to defeat an otherwise valid claim for benefits would unfairly prejudice a player who for whatever reason failed to make a claim at the exact time he became apparently totally disabled, and who thereafter recovered after some significant passage of time or circumstance.

28. If any weight at all is given to the doctor's reports, it supports a finding of total and permanent disability during the period from 1976 to 1984 and 1990 to the present. The report of the doctor commissioned by Defendant conflicts with the Board's finding that Plaintiff was not totally disabled from 1976 to 1984.

29. The Court concludes the Board's ruling is an abuse of discretion because it is arbitrary, not supported by substantial evidence, and violates the liberal construction requirements imposed on the Board in administering a benefit plan governed by ERISA.

30. The Defendants' attempt to exclude "disease" from coverage is contrary to the plain language of the documents, and therefore an abuse of discretion.

■ 31. Defendants' argument that Sweeney's disability arose sooner than 1976 is contrary to the plain language of the documents and therefore an abuse of discretion. So long as a player reports to training camp and plays through the season, he is not disabled. The Plans' contrary interpretation is unreasonable, and therefore an abuse of discretion.

32. There is no showing that Defendants failed to render a required decision within the time limits provided.

■ 33. Defendants must take their claimants as they find them. In this case, while it may be dictated by the incredible pressure to win which is the culture of professional football, the NFL's practice of furnishing drugs to players to maximize their performance and resistance to pain, caught a player who may have been unusually suscep-

tible to chemical dependency. It is a risk knowingly assumed by the NFL teams. When it creates a tragedy such as that shown by substantial evidence in this case, the Retirement Board may not turn its back on the player who is injured by the practice.

34. The drug administration by NFL teams was an assault on Plaintiff's body which caused damage to him.

■ 35. The causal connection between the injury and football is the basis for the "Active Football" classification.

36. The Court finds that Plaintiff is entitled to maximum retroactive "Football" benefits for the period from his discharge from the NFL in 1976 to the present (with the exception of the period from January 1984 through December 1989), plus pre-judgment interest thereon as of December 13, 1993.

37. Any retroactive amounts due Sweeney for periods prior to July 1, 1993 should be determined in accordance with the Old Plan (or other earlier versions of the Plan which were effective prior to that time), and Sweeney should be classified as "football" disabled for that period of time.

38. The introduction to the New Plan states, "[t]he Plan will govern all administrative matters on and after the Effective Date and all benefit payments that become due for periods on and after (but not before) that date." Article 5 of the New Plan provides benefits for total and permanent disability. In § 5.1 of that Article, the New Plan states that all benefits provided by Article 5 of the New Plan "will be retroactive to the later of (a) the first of the month following the date of the total and permanent disability, or (b) July 1, 1993, and will be payable for life or until cessation of such total and permanent disability." This clause means that if a player applies for benefits after July 1, 1993, but alleges that he became totally disabled before that date, his eligibility is determined under the Old Plan. This is true to the extent that the player is awarded benefits for periods during which the Old Plan was effective.

39. However, for the period of July 1, 1993 forward, when the New Plan is effective, the player should be awarded benefits in accordance with that plan.

40. The Court finds Plaintiff is entitled to maximum retroactive and present disability benefits from 1990 to the present, and into the future in accordance with all applicable provisions of the Plan relating to disability and retirement benefits not inconsistent with these Findings of Fact, Conclusions of Law, and Judgment, with pre-judgment interest as of December 13, 1993.

41. For the period from July 1, 1993 (the effective date of the New Plan) to the present, as well as the amount of his future benefit level, Sweeney's benefits should be determined in accordance with the disability categories defined in the New Plan. Plaintiff's disability is classified as 5.1(a) "Active Football" thereunder.

42. Plaintiff has suffered one period of disability from 1977 to the present. The Board's finding that the Plaintiff was not disabled between 1984 and 1990, while contrary to the Court's finding, is supported by substantial evidence and is accepted by this Court as being not an abuse of discretion by the Board. But even assuming Plaintiff was temporarily not disabled during that period, he did not suffer a new disability in 1990; he suffered no new causative agent. Rather, he relapsed back into his original disability which he appeared to have overcome temporarily. Plaintiff's 1990 disability is at best a relapse of his original disability which commenced in 1976, and was caused by football-related activities. The onset of Plaintiff's disability is concurrent with his eviction from the NFL—at which time he demonstrated his inability to cope with reality when he shot his pistol into his bunk. Defendants' restrictive interpretation of reoccurrence of the prior disability is not factually medically sound and violates ERISA in that it distorts the language of the Plans, rather than interpreting the Plans to the benefit of the plan beneficiary. Defendants abused their discretion in interpreting the documents in such a way.

43. Where there are no new intervening causes, and there is a reoccurrence or a relapse of the prior disability, it is the same disability. To determine disability one must look at the facts and circumstances surrounding the disability. Sweeney, at most, had a reoccurrence of a prior football-related injury and disability based upon the facts and circumstances of his disability of 1990.

44. When a player, like Sweeney, is disabled at the time he turns 55, the amount he is receiving as a disability benefit becomes his "normal retirement pension" amount, with some actuarial adjustment for joint and survivor.

45. The deemed payments provision of the Supplemental Plan does not apply to Sweeney.

46. The deemed payments provision of the Supplemental Plan (§ 3.2) conflicts with the CBA, Article II, Section 1, which provides that all conflicting documents are superseded by the CBA. Therefore, the deemed payment provision is superseded by the CBA, which authorized the Supplemental Plan to give additional benefits, and not to take any away. The CBA is the master document and all conflicting documents and provisions, including Section 3.2 of the Supplemental Plan are superseded by it.

47. If the Union Representative and the Owner Representative purported to mutually consent to the deemed payment provision, such "mutual consent" is invalid as it is inconsistent with the CBA.

48. The deemed payment provision (§ 3.2) of the Supplemental Plan is discriminatory in violation of ERISA § 510 in that it discriminates against people whose claims were not honored at the time they were eligible and who had to sue to enforce their claim to ERISA benefits. Only those who succeed are subject to the offset. It discriminates against those who, for one reason or another, were not properly categorized at an earlier time and had to sue for relief in a court of law to get payments paid retroactively to the date they should have been paid the benefits from the beginning.

49. The CBA did not contemplate the idea that there would be offsets required from certain people who were entitled to benefits, but not others. Because Section 3.2 of the Supplemental Plan is inconsistent with and contrary to the CBA, it is invalid.

50. The term "payment" as used in Section 3.2 means what the dictionary says it means, something that has already been given to someone. Payment refers to a past act.

51. A modification to the CBA does not require ratification so long as it is consistent with the CBA.

■ 52. When a collective bargaining agreement creates an ERISA plan, the law can enforce the ERISA plan.

53. The collective bargaining parties can modify and refine the CBA, but they cannot contradict what the basic document does. In the instant case, the basic document gives additional benefits. Section 3.2 of the Supplemental Plan eviscerates any meaning to the Supplemental Plan as to Sweeney, and it therefore unlawfully discriminates against him and others whose benefits have already vested. The CBA did not contemplate the notion of an offset required from certain people entitled to benefits, but not others.

■ 54. After due consideration of the Magistrate Judge's Report and Recommendation as well as Plaintiff's objections thereto and Defendants' response, the Court hereby adopts the Report and Recommendation of the Magistrate Judge regarding attorneys' fees and costs. Plaintiff is awarded attorneys fees of $195,452.00, which is 75.76%[2] of a reasonable lodestar fee of $257,988. Plaintiff is also awarded $2,240 for the recoverable costs incurred throughout this litigation. In addition, Plaintiff is awarded pre-judgment interest from December 13, 1993 on all retroactive amounts.

56. In the Court's August order, it directed the parties to attempt to come to a mutual agreement as to the reasonable amount of attorney's fees to be awarded to Plaintiff The Court noted that if the parties could not resolve this matter by agreement, then "[t]he party whose 'reasonable' figure is furthest from the amount as decided by the Court shall pay the attorneys fees and costs for the hearing to the prevailing party." (August Order at 25). The parties were unable to resolve their dispute over the reasonable amount of attorney's fees to be awarded to Plaintiff, and thus, the Court ordered the Magistrate Judge to hold a hearing and issue a Report and Recommendation as to the reasonable amount of attorney's fees in the instant case. Defendants' proposed fee award was closest to the fee award that this Court has deemed to be reasonable. As such, the Defendants are awarded reasonable attorney's fees for the time expended on the fee dispute.

Upon review of the Defendants' application for attorney's fees with respect to this issue, the Court finds that $10,000 is a reasonable amount of attorney's fees to be awarded to Defendants for their time expended on the fee dispute. That sum shall be deducted from Plaintiff's fee award.

57. Lastly, Defendants have submitted a request that the Court apportion the fee awards between the two Plans. Defendants propose that the fee awards be allocated in a manner consistent with the Court's formulation for establishing the success fraction. Of the 225 months for which Plaintiff obtained benefits (out of a total of 297 months claimed), 100 of them represented months in which he made claims against both the Player Retirement Plan and the Supplemental Plan, or 44.4% of the total months as to which he obtained court-ordered benefits. The remaining 55.56% of the months as to which he obtained court-ordered benefits were from the Player Retirement Plan only. As such, 77.78% of the judgment was against the Player Retirement Plan and 22.22% was against the Supplemental Plan. Defendants request that these percentages be used to apportion Plaintiff's fee and cost award between the two Plans. Plaintiff does not object to Defendants' proposed apportionment. The Court finds that this apportionment formula is reasonable and grants Defendants' request. Accordingly, Plaintiff's total fee award of $185,452 ($195,452—$10,000 credit

---

**2.** The 75.76% represents the percentage that plaintiff was a prevailing party in this action. Plaintiff was awarded benefits for 225 months, compared to the 297 months that he claimed he was entitled to disability benefits, thus resulting in a success fraction of and percentage of 75.76%.

to Defendants) should be apportioned as follows:

(i) Player Retirement Plan = \$144,244.56;

(ii) Supplemental Plan = \$41,207.44;

and Plaintiff's cost award of \$2,240 should be apportioned as follows:

(i) Player Retirement Plan = \$1,742.27;

(ii) Supplemental Plan = \$497.73.

LET JUDGMENT BE PREPARED ACCORDINGLY.