**Stephen P. COURSON, Plaintiff,**

**v.**

**BERT BELL NFL PLAYER RETIRE-MENT PLAN; Bert Bell/Pete Rozelle NFL Player Retirement Plan; Bert Bell NFL Player Retirement Trust; Bert Bell NFL Player Retirement Trustee; Bert Bell NFL Player Retirement Board; Bert Bell/Pete Rozelle NFL Player Retirement Board; The NFL Player Supplemental Disability Plan; The NFL Player Supplemental Disability Plan Disability Board; The NFL Player Supplemental Disability Plan Trust; The NFL Player Supplemental Disability Plan Trustees; The Plan Director; and Does 1 Through 100, Inclusive, Defendants.**

**No. CIV. A. 97–2366.**

United States District Court, W.D. Pennsylvania.

May 11, 1999.

Philip J. Murray, III, Thorp, Reed & Armstrong, Pittsburgh, PA, for plaintiff.

Ralph A. Finizio, Houston Harbaugh, Pittsburgh, PA, Thomas S. Gigot, Groom & Nordberg, Washington, DC, for defendants.

## MEMORANDUM OPINION

CINDRICH, District Judge.

This is an action for judicial review of certain eligibility determinations made under employee benefit plans covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001, *et seq.* ("ERISA"). On March 31, 1999, the court entered an order granting defendants' Motion For Summary Judgment (Doc. No. 12) and denying plaintiff's Motion For Summary Judgment (Doc. No. 22). This memorandum opinion sets forth the court's reasons for the order.

### I. *Background*

Plaintiff Stephen P. Courson ("Courson") was drafted by the Pittsburgh Steelers, a member club of the National Football League ("NFL"), in 1977 and played for the Steelers through the 1983 season. Administrative Record ("A.R.") 318, 320, 391–95 [1]. In 1984, he was traded to the Tampa Bay Buccaneers, where he played until the end of the 1985 season. A.R. 395. Tampa Bay later released Courson and, in June 1986, officially terminated his contract of employment. A.R. 100, 414.

Courson contends that during his career in the NFL, he was exposed to widespread use of anabolic-androgenic steroids ("AAS") among his teammates and other NFL players. Courson maintains that he began ingesting AAS to increase his size, strength, speed, and aggression to enable him to compete with other NFL players who used AAS.

Courson contends that he also began ingesting large amounts of alcohol, some of which was provided by the Steelers. Courson states that he used alcohol originally and primarily as a means to control the pain resulting from football injuries. He claims that he became addicted to alcohol because the pain was constant and more alcohol was needed as his tolerance level increased. Courson states that he chose alcohol in lieu of narcotic painkillers, which were frequently provided by team physicians, to quell his pain.

After his release from Tampa Bay, Courson began working on an autobiography, *False Glory.* By the spring of 1988, however, he was having financial difficulties due to a number of bad investments.

1. The administrative record for this case was submitted as Exhibit A to the Declaration of Sarah E. Gaunt ("Gaunt Decl.") (Doc. Nos.15–21). Specific items in the administrative record will be cited herein as "A.R. [page number]".

A.R. 419. He then decided to pursue a career in professional wrestling and soon thereafter competed in his first and apparently only match in Charleroi, Pennsylvania. A.R. 420. During this same period, Courson also competed in a weight lifting competition in Pittsburgh, Pennsylvania where he bench-pressed 605 pounds, winning first place in the super-heavyweight category. A.R. 421. Courson claims, however, that his excessive drinking continued during this period until he became ill in the fall of 1988. A.R. 1265.

In late November 1988, Courson drove to a hospital emergency room. A.R. 423. Following a battery of tests, the hospital's physicians concluded that Courson was experiencing heart failure. A.R. 140–43, 298. They diagnosed "dilated cardiomyopathy." A.R. 140–43, 298. According to Courson, cardiologist Richard Rosenbloom, M.D., explained that his muscle fibers were being "lost over time" and that his heart had become "flabby and baggy and doesn't pump as a normal heart should." A.R. 424.

In October 1992, Courson applied for disability benefits under the Bert Bell Plan ("Bert Bell Plan"), an employee pension benefit plan within the meaning of section 3(2)(A) of ERISA, 29 U.S.C. Section 1002(2)(A). A.R. 549. The Bert Bell Plan was established through a collective bargaining agreement between the National Football League Players' Association ("NFLPA") and the National Football League Management Council ("NFLMC"). Bert Bell Plan at Gaunt Decl. Ex. B (Doc. No. 21) ("Bert Bell Plan"). The relevant category of benefits provided by the Bert Bell Plan are as follows:

1) a monthly pension of "no less than $4,000 if disability results from a football injury incurred while an Active Player;" and

2) a monthly pension of "no less than $750 if the total and permanent disability results from other than a football injury;"

Bert Bell Plan p. 27. Thus, the Bert Bell Plan distinguishes between two types of

benefits, Football Injury benefits and Other Than Football Injury benefits.

The Bert Bell Plan provided for the creation of a Retirement Board composed of six voting members, three members selected by the NFLPA and three members selected by the NFLMA, and one non-voting member, the Commissioner of the NFL. *Id.* at p. 35. The plan states that,

> the Retirement Board shall have all necessary powers incident to the creation, administration, implementation and operation of the Plan and Trust, including but not limited to the power:
>
> A) To define and amend the terms of the Plan and Trust, to construe the Plan and Trust and to reconcile inconsistencies therein.

*Id.* at p. 36.

On his benefits application, Courson identified "Idiopathic Dilated Cardiomyopathy" as the nature and cause of his disability. A.R. 549. He listed November 1988 as the onset date for his disability. A.R. 549. His application included a report from cardiologist Mark E. Thompson, M.D. A.R. 543. Dr. Thompson confirmed that Courson was totally and permanently disabled, and that the disability onset date was November 26, 1988. A.R. 543. Dr. Thompson described the nature of the disability as "Idiopathic Cardiomyopathy." A.R. 543. In response to the question regarding whether the disabling illness or injury "result[s] from a football-related activity," Dr. Thompson checked "no." A.R. 544.

In December 1992, the Bert Bell Plan Retirement Board awarded Courson Other Than Football Injury benefits retroactive to December 1, 1988, the first month following the onset date of the disability. A.R. 550.

In June 1993, the NFLPA and NFLMC entered into a new collective bargaining agreement. A.R. 555–662. The agreement called for the Bert Bell Plan and the Pete Rozelle NFL Player Retirement Plan ("Rozelle Plan"), an ERISA plan similar to

the Bert Bell Plan, to be merged to form a new plan, the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Player Retirement Plan"). A.R. 631. The Player Retirement Plan governs eligibility determinations for benefits payable after July 1, 1993.

The Player Retirement Plan is an employee pension benefit plan within the meaning of section 3(2)(A) of ERISA, 29 U.S.C. Section 1002(2)(A). Among other things the Player Retirement Plan was designed to continue the payment of disability benefits to eligible players who had been awarded benefits under the Bert Bell Plan and Rozelle Plan (collectively referred to as the "Predecessor Plans"). A.R. 555–662, 631.

As was true for the Predecessor Plans, eligibility terms and benefit levels under the Player Retirement Plan are determined through collective bargaining between the NFLPA and the NFLMC and memorialized in the governing plan document. Gaunt Decl. (Doc. No. 15) para. 6. The Player Retirement Plan is also administered by a joint Retirement Board composed of six voting members, three selected by the NFLPA and three selected by the NFLMC. Gaunt Decl. (Doc. No. 21) at Ex. D ("Player Retirement Plan") p. 31. The plan document provides in relevant part that the Retirement Board,

> will have full and absolute discretion, authority and power to interpret, control, implement and manage the Plan and Trust. Such authority includes, but is not limited to:
>
>> (a) Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein;
>>
>> (b) Decide claims for benefits (except that the Retirement Board will follow decisions submitted to, and decided by, the Medical Advisory Physician or an arbitrator pursuant to Section 8.3);

*Id.* at 32.

The plan document also sets forth the following four-part classification scheme for awarding and paying total and permanent disability benefits:

> (a) (Active Football) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.
>
> (b) (Active Nonfootball) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.
>
> (c) (Football Degenerative) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season.
>
> (d) (Inactive) The monthly total and permanent disability benefit will be no less than $1,500 if (1) the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's last Credited Season. The minimum benefits provided under this Section 5.1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation.

*Id.* at 21–22.

In addition to the minimum $4,000 benefit provided by the Active Football, Active Nonfootball, and Football Degenerative classifications, each of these classifications automatically entitles a player to an addi-

tional monthly benefit under the NFL Supplemental Disability Plan (the "Supplemental Plan").[2] Gaunt Decl. (Doc. No. 15) paras. 5–6. The Supplemental Plan, is an employee benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. Section 1002(1). Gaunt Decl. (Doc. No. 21) Ex. F. ("Supplemental Plan") p. 1. The Supplemental Plan was also established through collective bargaining between the NFLMC and NFLPA. *Id.*

The plan's purpose is to provide additional disability benefits to certain players who also receive total and permanent disability benefits under the Player Retirement Plan. *Id.* Like the Player Retirement Plan, eligibility terms and benefit levels under the Supplemental Plan are determined through collective bargaining between the NFLPA and NFLMC and memorialized in the governing plan document. The plan is administered by a Disability Board composed of six voting members. *Id.* at 8. Three of them are selected by the NFLPA and three are appointed by the NFLMC. *Id.* The plan document provides in relevant part that the Disability Board,

> will have absolute discretion and final authority in (a) interpreting the Plan and adopting rules and regulations for the administration of the Plan, and (b) reviewing claims for benefits.

*Id.*

Taken together, benefit payments under the Player Retirement Plan and the Supplemental Plan equals $200,000 per year for players whose claims falls within one of these three categories. Supplemental Plan p. 5. Players whose claims are classified in the Inactive category do not receive benefits under the Supplemental Plan. *Id.*

Early in 1996, Courson petitioned the Player Retirement Plan's Retirement Board to reclassify his disability into one of the three higher-paying classifications, Active Football, Football Degenerative, or Active Nonfootball. A.R. 730–35. In his petition, Courson cited to his use of anabolic-androgenic steroids ("AAS") and alcohol during the years that he played in the NFL. *Id.* Courson contended that his use of AAS and alcohol during his football career was to blame for his disabling heart condition; and that such use should be considered "League football activities" for purposes of the Player Retirement Plan's disability classification scheme. *Id.* at 732–33.

In a letter decision dated July 18, 1996, the Player Retirement Plan's Retirement Board unanimously denied Courson's reclassification request, leaving intact Courson's current classification of Inactive for which he receives payments of $1,750 per month. A.R. 813–17. The Board concluded that Courson did not qualify for either Active Football, Football Degenerative, or Active Nonfootball benefits (1) because his disability did not arise during the time he was an Active Player; (2) because even if his disability did arise during the time he was an Active Player, it did not cause him to become totally and permanently disabled within 12 months of the onset date of the disabling condition; (3) because the taking of AAS and the consumption of alcohol are not League football activities;

---

**2.** The Supplemental Plan, is an employee benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. Section 1002(1). Gaunt Decl. (Doc. No. 21) Ex. F. ("Supplemental Plan") p. 1. The Supplemental Plan was also established through collective bargaining between the NFLMC and NFLPA. *Id.* The plan's purpose is to provide additional disability benefits to certain players who also receive total and permanent disability benefits under the Player Retirement Plan. *Id.* Like the Player Retirement Plan, eligibility terms and benefit levels under the Supplemental Plan are determined through collective bargaining between the NFLPA and NFLMC and memorialized in the governing plan document.

The Supplemental Plan is administered by a Disability Board composed of six voting members. *Id.* at 8. Three of them are selected by the NFLPA and three are appointed by the NFLMC. *Id.* The Supplemental plan provides in relevant part that the Disability Board,

> will have absolute discretion and final authority in (a) interpreting the Plan and adopting rules and regulations for the administration of the Plan, and (b) reviewing claims for benefits.

*Id.*

and (4) because even if the taking of AAS were considered a League football activity, there is no established scientific evidence that there is a causal relationship between the use of AAS and the development of dilated cardiomyopathy. A.R. 813–17.

Pursuant to the decision review provisions of the Player Retirement Plan, Courson appealed the Retirement Board's denial and submitted additional documentation related to AAS and alcohol use. A.R. 818–46. Courson also raised for the first time new theories of benefit eligibility with new onset dates. More specifically, Courson argued that he was entitled to benefits under the Bert Bell Plan from June 1986 through November 1988 because alcoholism rendered him disabled during this period. He further argued that his alcoholism was a League football activity which entitled him to the higher-paying Football Injury benefits during this period. Courson also claimed that his heart condition resulted from League football activities which entitled him to Football Injury benefits under the Bert Bell Plan from November 1988 through July 1, 1993.

The Retirement Board reviewed the supplemental documentation Courson submitted and sought and obtained additional information about the medical and non-medical issues related to AAS and alcohol use, all of which was made available for Courson's review and unanimously affirmed its previous determination that Courson only qualified for Other Than Football Injury benefits under the Bert Bell Plan for the period December 1, 1988 through July 1, 1993 and Inactive benefits under the Player Retirement Plan on an ongoing basis thereafter. A.R. 1645–1658. Courson filed the instant suit against the defendants [3] claiming that his application for benefits was denied in violation of ERISA. The parties then filed cross-motions for summary judgment which, as previously noted, the court ruled on in a March 31, 1999 order.

## II. *Standard of Review*

■ When an ERISA plan administrator is given discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the standard of judicial review of an administrator's eligibility determination is the arbitrary and capricious standard, a standard which is essentially the same as the abuse of discretion standard. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 114 (3d Cir.1994) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)); *Abnathya v. Hoffmann–LaRoche, Inc.*, 2 F.3d 40, 45 n. 4 (3d Cir.1993). Under this deferential standard, a plan administrator's interpretation of a plan may be disturbed "only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Abnathya*, 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa.1989)). A decision is supported by "substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Daniels v. Anchor Hocking Corp.*, 758 F.Supp. 326, 331 (W.D.Pa.1991).

■ "This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.' " *Id.* (quoting *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa.1984)). The administrator's interpretation "should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not con-

---

3. Unless otherwise specified, defendant Bert Bell NFL Player Retirement Plan; Bert Bell/Pete Rozelle NFL Player Retirement Plan; Bert Bell NFL Player Retirement Trust; Bert Bell NFL Player Retirement Trustee; Bert Bell NFL Player Retirement Board; Bert Bell/Pete Rozelle NFL Player Retirement Board; The NFL Player Supplemental Dis-

ability Plan; The NFL Player Supplemental Disability Plan Disability Board; The NFL Player Supplemental Disability Plan Trust; The NFL Player Supplemental Disability Plan Trustees; The Plan Director; And Does 1 Through 100, will be collectively referred to as the Defendants.

trary to the plain language of the plan.'" *Gaines v. Amalgamated Insurance Fund,* 753 F.2d 288, 289 (3d Cir.1985). Furthermore, the court's review of a determination is limited to a review of the record before the administrator at the time it made the decision. *Mitchell v. Eastman Kodak, Co.,* 113 F.3d 433, 440 (3d Cir.1997) ("[T]he district court should have asked only whether the Administrator's denial was arbitrary and capricious, on the basis of the record before the Administrator....").

## III. *Analysis*

Courson makes several legal and evidentiary arguments in support of his motion. We will first address the legal arguments.

### A. *Conflict of Interests*

Citing to *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), Courson argues that a standard or review more stringent than the arbitrary and capricious standard applies in this case because the Retirement Board was subject to conflicting interests. More specifically, Courson maintains that the Retirement Board's interests are in conflict with its duty to act in the best interests of the players and their beneficiaries because three of the six board members were selected by the NFLMC who has an interest to maintain a positive perception of the NFL. Courson contends that "[t]he Board, from a public relations point of view, had to deny Courson's application for benefits, because to award benefits it would be required to publicly admit that the NFL was aware of Courson's use of steroids and took no effective measures to eliminate their use by NFL players." Courson's Brief In Response To Defendant's Motion For Summary Judgment ("Courson's Resp. Br.") (Doc. No. 29) p. 4.

It is clear from the language contained in both the Bert Bell Plan and the Player Retirement Plan, and Courson does not argue to the contrary, that the Retirement Board is given complete discretion to interpret the terms of the respective plans and to make eligibility determinations. Even so, the Supreme Court stated in *Firestone,* "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. 948.

Although a conflict of interest requiring a more stringent standard of review may arise when an employer acts as the administrator of its own employee benefit plan, *see Abnathya,* 2 F.3d at 45 n. 5, no such conflict exists in the instant case. Under the Player Retirement Plan, and the Bert Bell Plan, the NFL employers' contributions are fixed, such contributions are held by a separate Trustee, and the funds may only be used for the exclusive benefit of players and their beneficiaries or for the payment of expenses of the plan. Bert Bell Plan p. 11–12; Player Retirement Plan p. 10. *See Abnathya,* 2 F.3d at 45 n. 5 (no conflict of interest where employer/administrator made fixed contributions to the plan's fund, which were held by a separate trustee, and the plan provides that the moneys in the fund may be used for the exclusive benefit of members under the plan or for the payment of expenses of the plan and the fund).

Indeed, the bad publicity conflict of interest Courson alludes to is conjectural. The Bert Bell Plan and the Player Retirement plan differ from the typical employer sponsored and administered plan in that both plans were established through collective bargaining between the employees and employers. Moreover, only three of the six voting Retirement Board members are selected by NFL management. The remaining three are selected by the players.

Accordingly, we find that there is no conflict of interest which requires special attention or a more stringent standard of review under *Firestone.*

### B. *Contra Proferentum*

Courson argues that he was entitled to have any ambiguities in the governing plan

documents resolved in his favor under the doctrine of *contra proferentum*. We disagree.

In *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 (3d Cir.1993), the Third Circuit adopted the doctrine of *contra proferentem* as a federal common law rule in ERISA insurance cases. The Court explained that the doctrine is used as a tool of last resort to construe an insurance contract that is fairly susceptible of two different interpretations. *Id.* The rule is predicated on the fact that insurance policies "are almost always drafted by specialists employed by the insurer," while the insured ordinarily has no input on the insurance bargain other than to pay premiums. *Id.* (quotations omitted). Thus, "an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament." *Id.*

█ The doctrine does not apply in this case. After having reviewed the relevant plans and the Retirement Board's eligibility determinations, *see* Section C infra, we find no ambiguities which would require application of the doctrine. In addition, the underlying rationale for the doctrine is absent in this case as the plans at issue were the product of collective-bargaining between two sophisticated parties. Although the Third Circuit has not spoken on the issue, we find that the doctrine is inapplicable under these circumstances. *See Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 n. 3 (9th Cir.1993) ("[T]he rule does not apply to ERISA plans that are the product of collective bargaining agreements reached after arms-length bargaining between parties of equal power...."); *see also, Pittston Co. Ultramar America v. Allianz Ins. Co.*, 124 F.3d 508, 521 (3d Cir.1997) (doctrine of *contra proferentem* does not apply to insurance contracts that are negotiated and jointly drafted).

### C. *Retirement Board's Eligibility Determinations*

Courson raises the following issues in connection with the Retirement Board's eligibility determinations.

1) Did Courson qualify for Other Than Football Injury benefits under the Bert Bell Plan for the period June 1986 through November 1988 due to alcoholism?

Courson argues that the Retirement Board's decision to deny him "Other Than Football Injury" benefits under the Bert Bell Plan for the period June 1986 through November 1988 was arbitrary and capricious. Courson contends that the record establishes that he was totally and permanently disabled during this period due to alcoholism. He cites, for example, his Federal Income Tax Returns for the years 1986 through 1988 which reflect deferred salary and severance benefits from Tampa Bay as his only income. A.R. 1268–1323.

Courson also cites to his affidavit wherein he states that:

> After the 1985 season, my alcohol use continued and I again began using AAS. After mini-camp in April 1986, my alcohol use was out of control and I abused alcohol almost daily. From April 1986 until my release from Tampa Bay, I found it difficult to concentrate on certain aspects of required football training because of my excessive drinking. In fact, with the exception of weight lifting, I did little, if any, conditioning.

A.R. 1265. With regard to the effects of his drinking, Courson cites to a June 11, 1997 letter from Paul J. Freyder, an expert in alcohol related diseases, wherein Mr. Freyder opines that "from 1986 until [Courson's] heart condition was diagnosed in November 1988, his alcoholism consumed his life and substantially prevented him from or rendered him unable to find (and maintain) any employment during that time." A.R. 1253–1254.

The Bert Bell Plan states that a player is "totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit...." Bert Bell Plan p. 27. The Retirement Board concluded that Courson did not meet this definition for the period June 1986 through November 1988. The Board cited several excerpts from Courson's book *False Glory* wherein he describes some of his activities during this period. The Retirement Board noted, for example, that,

> Mr. Courson states that, after the conclusion of Tampa Bay's 1986 mini-camp, he asked to be traded. *False Glory* at 123. The Buccaneers obliged by releasing him two weeks later. Mr. Courson states that he spent the next month in Myrtle Beach "hoping that someone [i.e., another NFL Club] still might call. I worked out with weights and ran every day." *Id.* at 124. Mr. Courson next reports that in September 1986, after the Buccaneers officially announced his retirement from football, he "took the first fall vacation of my life. I flew to Munich for Oktoberfest." *Id.* After his return from Germany, Mr. Courson "rented a cabin in Wyoming and began taking notes for a possible book, ..." *Id.*

By the Spring of 1988, however, Mr. Courson found that he "was flat broke," having lost "more than $500,000" through a number of bad investment schemes. *Id.* at 129–130..... Mr. Courson explains, he decided "to pursue a career in the wrestling ring. I figured I could make a lot of money fast and then get out." *Id.* Mr. Courson described his 1988 professional wrestling exploits this way:

> In a short time, I was ready for my first match, in Charleroi, a small town about 20 miles south of Pittsburgh. Also on the card that night were Tony Atlas and the Sheik, a couple of big names in the "sport." My bout that night was against the Blue Cyclone.
>
> After only three days of practice, they didn't want to give me anything too complicated. So the Cyclone and

I basically followed the script to the letter: I gave him a couple of hip tosses, threw him off the ropes, lifted him, body-slammed him to the canvas, and then covered him up. Bing-bang-boom. In no time I had squashed his butt for my first wrestling "victory." *Id.*

At about the same time, Mr. Courson also competed in weight lifting events. He described his success at a September 10, 1988, meet as follows:

> Competing in the bench press, I nailed 575 pounds without even breaking a sweat. Then they moved the weight up to 605, and I smoked that on my second attempt. It was a great feeling to have accomplished my goal; it had been a while since I'd felt such exhilaration. Everybody else in my weight class—superheavyweight—soon dropped out, and I had my first weight lifting victory.

A.R. 1656–57.

With regard to Courson's earnings during the period, the Retirement Board stated that "the lack of a large income does not mean someone is totally and permanently disabled...." A.R. 1657. The Retirement Board also concluded that Mr. Freyer's opinion was "completely implausible" in light of the facts Courson reported in *False Glory*. A.R. 1655. Indeed, it does appear that Courson described his post-football experiences far differently in *False Glory* than he did to Mr. Freyer. A.R. 1655.

Courson attempts to discredit the Retirement Board's analysis arguing that participation in one wrestling match and competing in a weight lifting competition for several hours does not mean he was capable of holding employment. Courson cites to his own affidavit wherein he states that certain facts appearing in *False Glory* were embellished by his publisher. These arguments are unpersuasive.

First, Courson's wrestling, weight lifting and book writing activities were sig-

nificant indicators that Courson was not incapable of engaging in any occupation or employment for remuneration or profit. Although Courson's failure to earn a significant amount of income from such activities is probative, we cannot say that the Retirement Board's finding that Courson was not disabled during this period due to alcoholism was unreasonable or unsupported by substantial evidence because of such evidence.

With regard to Courson's various renditions of events, it was the Retirement Board's responsibility to weigh the evidence and assess the credibility of Courson's statements. The Retirement Board's reliance on Courson's statements in *False Glory* was not arbitrary and capricious. Courson's efforts to negate his detailed accounting of events in *False Glory* with a subsequently prepared affidavit, composed of a few conclusory statements, is unconvincing. Similarly, the Retirement Board's discounting of Mr. Freyder's report was also reasonable. Mr. Freyder's report was based on Courson's own statements which conflicted with or put a new spin on statements previously made in *False Glory*.

In sum, we find that the Retirement Board's decision that Courson was not entitled to "Other Than Football Injury" benefits under the Bert Bell Plan for the period June 1986 through November 1988 was not arbitrary and capricious as substantial evidence supports the Retirement Board's decision that alcoholism did not render him totally and permanently disabled during such period.

2) Did Courson qualify for either Active Football, Active Nonfootball, or Football Degenerative benefits under the Player Retirement Plan from July 2, 1993 until the present?

Courson argues that the Retirement Board's decision to deny him either Active Football, Football Degenerative, and Ac-

tive Nonfootball benefits under the Player Retirement Plan was arbitrary and capricious.

a) Active Football and Football Degenerative Benefits

The Retirement Board denied Courson's application for Active Football and Football Degenerative benefits based on its finding that Courson did not suffer from a disability which resulted from or arose out of a League football activity. As previously noted, a player's disability must result from or arise out of a League football activity to qualify for either Active Football or Football Degenerative benefits. Courson argues that the Retirement Board's decision was not supported by substantial evidence as the record establishes that his disabling heart condition was caused by his consumption of large quantities of alcohol and use of AAS, both of which were League football activities.

Courson cites to his own affidavit and other correspondence to the Retirement Board wherein his states that he chose to consume large quantities of alcohol, in lieu of narcotic painkillers, to quell his pain from football injuries and to cope with the inherent stress of competing in the NFL. A.R. 733, 1262, 1265–66. He also references certain incidents which he contends demonstrate that the NFL was aware of his abuse of alcohol and that the organization took few measures to assist him in overcoming his addiction. *Id.* He further maintains that the Steelers provided players with alcohol. *Id.*

With regard to his taking of AAS, Courson cites to affidavits and statements from several former NFL players, coaches, and administrators; United States Senate hearing transcripts addressing steroid use in the NFL [4]; and manuscripts and newspaper articles, all of which allegedly confirm the widespread use of AAS in the NFL during the time Courson was an active player. A.R. 180–289, 771, 1250,

---

4. In April 1989, the United States Senate conducted a two-day public hearing focusing on the use of steroids in football.

1259. Courson also cites to his affidavit and other correspondence to the Retirement Board wherein he states that beginning with his Rookie season in 1977 he was exposed to widespread use of AAS among his teammates and other NFL players. A.R. 732–35, 1260–67. He contends that the use of AAS was rampant in the NFL because of the competitive environment which rewarded players with size, strength, and speed. *Id.* Courson further maintains that the NFL took no action to prevent his and other players' use of AAS even though the organization knew of such use. *Id.* Courson contends that although the NFL had a policy against the use of AAS, the policy was not enforced.

■ We find that substantial evidence supports the Retirement Board's conclusion that Courson's heart condition did not result from or arise out of a League football activity. The Player Retirement Plan contains the following definition for "arising out of League football activities":

> "Arising out of League football activities" means a disablement arising out of any League pre-season, regular season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities....
>
> \* \* \* \* \* \*
>
> "Arising out of League football activities" will not include any disablement

resulting from other employment or activity initiated by the Player outside of official pre-season training, including athletic activity for recreation or for the general purpose of maintaining or achieving playing condition.

Player Retirement Plan p. 27.[5]

The Retirement Board concluded that Courson's use of alcohol and AAS did not fall within this definition as such activity was not "supervised or required or directed" by an Employer. A.R. 1649. The Retirement Board correctly pointed out that there is no evidence that the Steelers or Tampa Bay ever prescribed or provided Courson with AAS; NFL policy expressly prohibited the serious misuse of alcohol and the illegal acquisition, distribution, and/or misuse of legal prescription drugs, including AAS; every one of the standard NFL Player Contracts signed by Courson prohibited the use of stimulants or other drugs for the purpose of enhancing on-field performance; and former Steelers head coach Chuck Noll communicated these same prohibitions to all players orally at least once each season. A.R. 15, 25, 34, 47, 58, 69, 88, 117, 1176–1183, 1514–1517, 1651. Furthermore, alcohol was only made available after games and it was the Steelers' policy to limit players to only two cans of beer on the plane ride home from away games. A.R. 1514–1517, 1650. The

---

**5.** Courson argues that the Retirement Board's reliance on this definition was improper for several reasons. First, Courson contends that the Retirement Board should not have relied on this definition because it appears in Section 6 of the Player Retirement Plan which deals with line-of-duty disability benefits while his application for benefits is governed by Section 5 which covers total and permanent disability benefits. We disagree. The plan document gives the Retirement Board broad discretion to interpret and apply the terms of the plan. Here, the Retirement Board relied on a specific definition for the same term which appears in a related section of the same plan. The resulting interpretation was not contrary to the plain language of the plan and was certainly reasonable. Indeed, it would have been unreasonable for the Board to disregard or ignore this definition.

Courson also contends that because the phrase "arising out of League football activities", which appears in the description of Football Degenerative benefits, differs from the phrase "results from League football activities", which appears in the description of Active Football benefits, the Retirement Board should not have used the Section 6 definition which only defines "arising out of" League football activities. Again, the Retirement Board has broad discretion to interpret the terms of the plan and it exercised such discretion when it interpreted these phrases in the same fashion. It was reasonable that the Board used the same definition as there is no practical difference in the phrases "arises out of" and "results from".

players were never required or directed to consume alcoholic beverages. A.R. 1516.

Courson's blanket assertion that the Steelers and Tampa Bay knew of his AAS use and alcohol abuse but took no action is contrary to the record evidence. As to his use of AAS, for example, Courson states in *False Glory* that he decided to "come clean" for the first time about his steroid use in a *Sports Illustrated* article which was published in the Spring of 1985. A.R. 404. Prior to 1987, when Courson played, NFL clubs were not permitted to test for AAS. A R. 1515. Courson did inform Steelers team physician Anthony P. Yates, M.D., during a 1983 preseason physical that he used AAS in the past. Dr. Yates testified in an affidavit, however, that Courson stated that he was not currently using AAS. A.R. 1518–19. Dr. Yates contends that he performed a more stringent examination of Courson and warned him of the dangers of using AAS. *Id.* Dr. Yates states that he did not report Courson to team management because of physician/patient confidentiality considerations and because he had warned Courson of the dangers of using AAS and Courson had indicated that he was no longer taking AAS. *Id.*

Two years later in 1985, Courson made a similar confession to Remigio Palumbo, M.D., a cardiologist to whom Courson had been referred to because an electrocardiogram performed on Courson during a preseason physical revealed some abnormalities with his heart. A.R. 401. When asked whether he was currently on any medications, Courson informed Dr. Palumbo that he was "in the middle of a substantial AAS cycle." A.R. 401. Dr. Palumbo instructed Courson to "stop using [AAS] immediately." A.R. 401. Courson reported that shortly thereafter he "vowed to play clean". A.R. 412. Around the same time, Courson reported to Edward Klein, M.D., a psychiatrist to whom he had been referred in 1985 after informing Tamapa Bay management that he thought he had a drinking problem, that he had stopped using AAS. A.R. 958.

As to his alcohol consumption, Courson does not contend that alcohol was ever prescribed to him for pain or that anyone ever suggested that he consume alcohol to control pain. Nor is there any evidence that Courson ever informed anyone that he had decided to consume alcohol for pain in lieu of taking medication prescribed by team physicians. Moreover, Courson does not contend that he ever drank on the job. In fact, Courson reported in *False Glory* that he really did not match up with the typical alcoholic profile because he was rarely late for work, never started a fight in a bar, and did not drink every day. A.R. 418. This recollection is consistent with Coach Noll's, who states in his affidavit that neither he nor anyone on the coaching staff had knowledge that Courson was abusing alcohol. A.R. 1516. Coach Noll states that Courson never appeared inebriated at any practices or games. *Id.*

Indeed, it appears that the first time Courson ever informed team management of his drinking problem was in 1985 when he told Tampa Bay's head coach that he wanted to retire and that his frustration with recently being demoted to second-string was causing him to drink more heavily than usual. A.R. 402. Tampa Bay responded to Courson by referring him to Dr. Klein for counseling. A.R. 958. Dr. Klein reported that Courson wanted "to talk about concerns he has about his alcohol consumption." *Id.* Dr. Klein continued to see Courson on a weekly basis and offered to prescribe an impatient facility. *Id.*

In sum, we find that substantial evidence supports the Retirement Board's decision that Courson's taking of AAS and abuse of alcohol does not fall under the definition of results from or arises out of League football activities. The record overwhelmingly supports the Retirement Board's conclusion that Courson decided to overindulge in alcohol and use AAS on his own initiative, on his own time, and in knowing contravention of NFL policy. Moreover, as soon as Courson informed the Steelers and Tampa Bay of his AAS

use and abuse of alcohol, he was instructed to stop and provided with medical resources to assist him in doing so.

Although not necessary in light of its finding that Courson's taking of AAS and alcohol consumption were not League football activities, the Retirement Board went on to consider Courson's argument that his heart condition was caused by AAS use and alcohol abuse. The Retirement Board concluded that there was no established scientific evidence of a causal relationship between AAS use and dilated cardiomyopathy. The Retirement Board held, therefore, that even assuming, contrary to its previous finding, that Courson's AAS use was a League football activity, it could not conclude that Courson's heart condition resulted from such activity. The Retirement Board did state, however, that the evidence indicates that alcohol abuse, rather than AAS use, may have caused Courson's condition.

Courson contends that the Retirement Board's conclusion on this issue was arbitrary and capricious, arguing that the record proves that Courson's AAS use and alcohol abuse caused his heart condition. Courson cites to the statements of several experts who addressed the issue.

After having reviewed the evidence, we find that the Retirement Board's determination that there is no causal relationship between AAS use and dilated cardiomyopathy was not arbitrary and capricious. For example, although four of the six experts, Charles E. Yesalis, M.D., Gary Ferenchick, M.D., Judith Orie, M.D., and Christopher Bonnet, M.D., state with varying degrees of certainty that AAS use is a cause of dilated cardiomyopathy, they all recognize that there have been no epidemiological studies on the relationship between AAS use and dilated cardiomyopathy. A.R. 739, 1201–1202, 1210–1212, 1236–1239. The primary evidence cited in support of their conclusions are isolated, anecdotal reports of three known users of AAS who died of cardiomyopathy: a Danish body builder with dilated cardiomyopathy; one case of hypertrophic cardiomyo-

pathy; and one case of myocarditis. A.R. 1653. Each death could have been due to a different disease of the heart muscle, as dilated cardiomyopathy is distinguished from hypertrophic cardiomyopathy, which is an inherited disease, and myocarditis, which is an infection or inflammatory disease of the heart muscle. A.R. 1653. There is only one known death from dilated cardiomyopathy in a person using AAS, therefore, out of these three studies. A.R. 1653.

The remaining two experts, Richard A. Schwartz, M.D., and C. Wayne Bardin, M.D., state that there is no clinical evidence which links AAS use and dilated cardiomyopathy. A.R. 946, 948–952, 1643–1644. Dr. Bardin also points out that medical science has identified more than 75 causes of dilated cardiomyopathy. A.R. 948. Although alcohol is among them, AAS is not. A.R. 948. Indeed, Dr. Schwartz concluded that alcohol abuse is the only credible cause of Courson's condition. A.R. 946. Moreover, Drs. Yesalis, Ferenchick, Orie, and Bonnet all recognize that alcohol abuse is a known cause of dilated cardiomyopathy and concluded that Courson's drinking played a role in the development of his condition. A.R. 739, 1201–1202, 1210–1212, 1236–1239. In sum, it was not arbitrary and capricious for the Retirement Board to find that the only credible medical evidence indicates that alcohol abuse may have caused Courson's heart condition based on the evidence of record.

Our discussion does not end here, however, as Courson asserts two additional theories of causation. First, Courson argues that his abuse of alcohol, which was a League football activity, caused his heart condition. Even though the Retirement Board noted that alcohol abuse was the likely cause of Courson's heart condition, this argument fails based on the Retirement Board's finding that alcohol consumption was not a League football activity.

Courson also asserts a more tenuous theory of causation. He argues that the

Retirement Board should have held that Courson's heart condition resulted from League football activities because the evidence establishes that the psychological effects of AAS use, a League football activity, caused him to abuse alcohol, which in turn caused his heart condition. Again, the Retirement Board's finding that AAS use was not a League football activity is fatal to this argument. In addition, the only evidence Courson cites to in support of this alternative theory is the following:

(1) A May 24, 1996 letter from Courson to the Retirement Board wherein he states that: "As my career progressed my dosing habits became more sophisticated and I became increasingly dependent on the use of AAS. With the higher doses my personality started to be affected adversely and this I believe effected [sic] my alcohol consumption." A.R. 733.

(2) A September 9, 1996 letter from Courson to the Retirement Board wherein he states that: "There is additional research by the National Institute on Drug Abuse (NIDA) in a recent 1991 household study that links AAS use with the propensity to use or abuse alcohol and other substances." A.R. 819

(3) A May 16, 1996 letter from James Shaver, M.D., to Courson's attorney wherein he states that: "In summary, a review of Mr. Courson's history would substantiate the probable causal relationship between excessive alcohol use and the subsequent development of idiopathic cardiomyopathy in your client, Mr. Steven Courson. *It is also possible* that the anabolic steroid use, through its psychological effects, contributed to an enhancement of his alcohol intake over and above what it might have otherwise been." A.R. 742 (emphasis added).

The Retirement Board could have properly consider this evidence as speculative and as such, that it provided little support for Courson's theory.

**6.** As previously noted, a player must qualify for either Active Football, Football Degenerative, or Active Nonfootball benefits under the

Accordingly, we find that the Retirement Board's decision to deny Courson Active Football and Football Degenerative Benefits was not arbitrary and capricious.

b) Active Nonfootball Benefits

Courson contends that the Retirement Board acted in an arbitrary and capricious manner when it denied him Active Nonfootball benefits. Courson argues that even if his substance abuse problems were not League football activities, they were nonfootball activities which rendered him totally and permanently disabled shortly after he ceased being an active player. We disagree.

Courson ceased to be an active player no later than June, 1986. As previously noted, a player qualifies for Active Nonfootball benefits if such player's (1) disability does not arise from League football activities; (2) the disability arises while the player is an Active Player; and (3) the disability causes the player to be totally and permanently disabled "shortly after" the disability first arises. The term "shortly after" is defined in the Player Retirement Plan as excluding any period longer than 12 months. Player Retirement Plan p. 21.

The Retirement Board rejected the theory of disability which would have fallen within the requisite 12 month period, alcoholism. As noted supra, the Retirement Board determined that Courson was not disabled due to alcoholism from June 1986 to November 1988 and the court has already concluded that such determination was not arbitrary and capricious. Also, Courson became disabled from dilated cardiomyopathy at the end of November 1988. Thus, even if this condition was caused by something which could be traced back to his playing days, he was not disabled from such condition within 12 months of his ceasing to be an active player.

Accordingly, the Retirement Board's decision to deny Courson Active Nonfootball benefits was not arbitrary and capricious.[6]

Player Retirement Plan to be eligible for benefits under the Supplemental Plan. Thus, it was

3) Did Courson qualify for Football Injury benefits under the Bert Bell Plan for the period June 1986 through July 1, 1993?

Courson argues that the Retirement Board's decision to deny him Football Injury benefits under the Bert Bell Plan for the period June 1986 through July 1, 1993 was arbitrary and capricious. More specifically, Courson contends that "the record as a whole establishes that [his] addiction to alcohol and his dilated cardiomyopathy resulted from playing football." Plaintiff's Response To Defendants' Opening Brief (Doc. No. 29) p. 24. Therefore, he contends that he was entitled to Football Injury benefits from June 1986 through November 1988 due to alcoholism and from December 1, 1988 through July 1, 1993 due to his heart condition.

As previously noted, one is entitled to the higher paying Football Injury category of benefits under the Bert Bell Plan if a disability results from a football injury. Courson's alcoholism argument is rendered moot based on our previous ruling that the Retirement Board's finding that alcoholism did not render Courson totally and permanently disabled from June 1986 through November 1988 was supported by substantial evidence.

As to his heart condition, Courson makes the same arguments that he made in support of his claim that he is entitled to Active Football and Football Degenerative benefits under the Player Retirement Plan. In other words, his alcohol addition and AAS use were football activities which caused his heart condition. Therefore, his heart condition is a football injury.[7]

This argument fails for the reasons we have already stated. The use of alcohol and AAS were not football activities. Again, Courson's abuse of these substances was on his own time, on his own initiative, and in contravention of NFL policies.

Accordingly, we find that the Retirement Board's denial of Courson's request for Football Injury benefits under the Bert Bell Plan was not arbitrary and capricious.

## IV. Conclusion

There is logic in Mr. Courson's argument that his current condition is directly or indirectly the product of his many years of playing NFL football. Indeed, it is doubtful that he would find himself in his present predicament were it not for his participation in that activity. It would be hard-hearted to lack compassion for him and for all the young men who are so willing and even eager to sacrifice their lives and bodies for the sake of this modern American spectacle, and, of course, the fame and fortune it brings to them.

There is also room to spread the responsibility for Mr. Courson's plight. He imbibed and ingested of his own volition, mostly against league rules. Nonetheless, it is difficult not to question the value system of a society which places Sumo-like size and strength above the health and well-being of the human combatants it pays for entertainment. But it is not the role of the court to judge contemporary tastes in sport or entertainment.

Nor would it be proper for the court to alter carefully crafted terms and conditions of retirement plans arrived at through the collective bargaining process.

not necessary for the Retirement Board to address the possibility of benefits under the Supplemental Plan.

**7.** Courson relies heavily on the case of *Sweeney v. Bert Bell NFL Player Retirement Plan,* 961 F.Supp. 1381 (S.D.Cal.1997) to support his argument that his alcohol addiction and heart condition were football injuries. We note that this decision was reversed by the Ninth Circuit shortly after Courson filed his summary judgment motion. *See Sweeney v. Bert Bell NFL Player Retirement Plan,* No. 97–55785, 156 F.3d 1238, 1998 WL 480125 (9th Cir. Aug.7, 1998). We further note that the facts of the instant case are clearly distinguishable from those in *Sweeney,* which involved a player who became addicted to certain narcotics that were prescribed by team physicians.

If the NFL and the players wish to expand the coverage of their retirement plans to include those who find themselves in Mr. Courson's circumstances, it is within their power to do so.

As indicated in Part II above (Standard of Review), the role of the court in reviewing the discretionary determinations of ERISA fiduciaries is quite limited. Mr. Courson's right to recovery is not based on a mere connection between his present condition(s) and football, but upon the precise language of the governing ERISA plans.

After reviewing the entire record we find that substantial evidence supports the Retirement Board's decision that under the Plan language, Courson qualifies only for Other Than Football Injury benefits under the Bert Bell Plan for the period December 1, 1988 through July 1, 1993 and Inactive benefits under the Player Retirement Plan on an ongoing basis thereafter.

An order consistent with this memorandum opinion was entered on March 31, 1999.